Good morning. May it please the Court. Veronica Melendez for Appellants. I'd like to reserve four minutes for rebuttal. Okay. Please watch the clock. We're here today because a group of farm workers who worked the land and harvested and packed the strawberries under respondents' logos and standards were not paid their wages. The tenant farmers who directly employed them failed to pay them properly and are now in bankruptcy. Well, you say it's actually indirectly, is it not? The tenant farmers contract with the labor contractor for their services. Isn't that the arrangement? No. In this case, it's Better Produce and Red Blossom contracted with the tenant farmers to cultivate strawberries, which were labored by the workers. Right. But the labor contractor supplies the actual farm workers. Isn't that right? Or did I misunderstand there? Not in this case, Your Honor. Under 2810.3, it changes the definition of labor contractor, what it means to be a labor contractor. Before we get to the question of the statute, just help me with the basic facts of who contracts with whom. First, the tenant farmer contracts with the land owner to lease the land for purposes of growing strawberries, right? That's one contract. Correct. Then the tenant farmer contracts with a labor contractor for the actual farm workers who perform the work in farming the land under the supervision of the tenant farmer. Not in this case, Your Honor. The way that it worked, it was the Better Produce and Red Blossom contracted with the tenant farmers, who we're arguing is the labor contractor under 2810.3. The tenant farmers hired the laborers. Is that right? Correct. They directly hired the workers. Oh, I see. Okay. All right. So now we're here because the farm workers are seeking payment from respondents, the entities for whom those strawberries were produced. Red Blossom and Better Produce said that the strawberries that the farm workers harvested and packed under their signature labors were grown by them. California enacted a new law, Labor Code Section 2810.3, for this reason, so that the risk of the unpaid wages doesn't fall on the farm workers, but it falls on the companies who use their labor to regularly provide their core product to their customers. So I had a question about the statute. The definition of labor contractor means that it's the entity that supplies workers to a client employer, and the corresponding definition of client employer is an entity that has provided workers. So the Better Produce and Red Blossoms weren't supplied with workers in any direct way. Is that correct? So the workers were not supplied in the sense that they were doing their work and the workers worked directly for Better Produce. Is that correct? If I'm understanding your question, and I'll try to answer and let me know if my answer makes sense, but here with supplied, it's not necessarily that the workers need to be supplied, for example, to be selling products. Right, but the language of the statute uses the word supply, and so there was no direct supply of workers. Workers didn't change hands. The workers continued to work for the tenant farmers. So you're asking us for a broader definition of supply. Is that correct? No, Your Honor, I would disagree with that, and that's because of the legislative purpose here. No, no, I'm just asking about the words of the statute. Correct. So under the statute, supplied can mean something that is needed or wanted by somebody. Okay, so your definition of supply is not direct supply to the employer. It's something further, more vague or indirect. Is that correct? Yes. Okay, thank you. But they have to be performing work within the client employer's usual course of business. Correct. That is one of the limitations from the statute, and one of our arguments is that in this case supplied because it's needed or wanted, and here because of the legislative purpose, what we're arguing is that when it's a company that outsources its liability for the labor, that they need to produce the core products that they're selling to their customers. One of the problems I had with your argument is that there was, and I think the opposing counsel makes this point, and I wanted your response, was there was no stopping point based on your very broad definition of the statutory terms. So in other words, their point, the opposing counsel's point, is the grocer would equally be responsible for the wages of the farm workers under your definition. What's the stopping point, and which word in the statute do you rely on for a stopping point? So the stopping point, it's all three. One is all three terms, labor contractor. So tell me what the stopping point is. Why is it the grocer, as opposing counsel argues? So the reason the grocery store would not be responsible, it's one, it's the regular and customary work. The regular and customary work of a grocery store, it's providing, for example, thousands of different products to a customer, right? Well, no, it's also providing strawberries. So the grocer is providing strawberries as part of its usual and customary work. Are you saying as long as they do other things, it's not part of their usual and customary work? And would that apply to better produce as long as they're doing other things? Then the sale of strawberries is not usual and customary? It's not just simply that they're doing other things. And I'm sorry, I feel like, but it's also, so our argument, it's the core business, right? So for better produce and red blossom, their core product that they produce was the strawberries. So you say usual and customary work, it has to be the core work? And how do you define core work? It would be the core product or service they're providing. So for red blossom and better produce, it's strawberries. For a grocery store, it's providing thousands of different products for somebody to come in and buy. So if better produce also sold citrus fruits, then they would no longer be a client employer because strawberries would only be a part, maybe it's only 20% of what they sell. Then they would no longer be a client employer. Is that your position? My position is it depends on the facts, for example. For example, from the facts of this case, it's the core work, which is the strawberries, but it's also how they represented themselves. They represented themselves as growing the strawberries. For the citrus example that you're giving me, it would also depend on whether they're representing themselves as also growing the strawberries themselves and how much, for example, how much they insert themselves into the production of those citruses like they did with the strawberries. Let me ask a follow-up question to that because it seemed in the record that you were focusing on the fact, at least with regard, I believe it was red blossom, that they represented themselves as strawberry growers in the labeling on the boxes. So let me ask a hypothetical. I don't know if Costco has a Kirkland brand of strawberries, but let's assume that they do and that they have certain quality control requirements before they will allow the strawberries that they purchase through a middle man like red blossom, but their label goes on the box that these are Kirkland strawberries. Would they then fall within the definition of 2810.2 under your theory of the case? No, Your Honor, because you still need to meet the premises and worksite standard, even though it might be within their regular and customary work because let's say they represent that they grow the strawberries as well and they put certain quality standards that need to be met. But I'm assuming if they establish quality standards that they would then be sending representatives to the worksite in order to make sure that they were getting the quality of strawberry that they had specified, which I think you focus on in your briefing as a significant fact that makes red blossom a liable under the statute. Correct, Your Honor. In that case, if Costco, for example, is sending its own quality personnel to monitor, which also becomes the worksite of their own employees,  then the answer to Judge Okuda's question is that the grocery store could be liable under that hypothetical fact situation. Correct, depending on the facts as well. If the growing could be said to be in their usual course of business. Correct. I thought you said that the growing, it didn't have to be in their usual course of business as long as it provided a product or service that they had sold to the customer. So long as Costco is selling strawberries and somebody is growing them, I understood from your brief that not only would that be part of their usual course of business, but that wherever the item was grown that they then sold would be a worksite under the statute. Is that wrong? I'm sorry, Your Honor. You said it was a worksite if it was a place where a product or service was produced that the client employer then sold, that that would constitute their worksite. It didn't have to be their own premises or the like. Correct, Your Honor. So if Costco is selling strawberries, the strawberries are produced on the farms by these individuals, so the farm would be the worksite because it's producing strawberries that they then sell. Why isn't that the natural reading based on your interpretation? Because it's not just necessarily performing the actual work of the strawberries, but what they represented themselves as providing. So you're saying it's all about the advertising. So if Better Produce had not advertised that they were sellers, then they would not be client employers. Is that right? No, Your Honor. It's not just the advertising. The advertising is a part of it. Their own definition about what their business is is what they're saying is they're growing. And if Costco said these are our Kirkland strawberries, they're grown to our specs or we grow them with our friends, would that be enough to make them client employers? If they're representing themselves as that being their business and that they did it, if they also have sufficient connection to the premises and the worksites they're associated or connected, and then also the argument is that the labor was supplied for them as well. But the connection would be sending Costco quality control people to the worksite to actually examine the crops and make sure that they're getting their quality. If I may answer that question in rebuttal, my time is up. No, I would like an answer to it now. I'm sorry. Do you mind repeating your question? Yeah. Isn't it important in your analysis of the statute that in our hypothetical, Costco is sending quality control inspectors to the fields to actually make sure that Costco is getting the strawberries pursuant to the quality that it has specified in the growing contract? Correct, Your Honor. That is important to our analysis. But one of the other considerations is that the legislature was trying to capture different industries and different worksites. So here one of the connections is that they were sending the workers to monitor, for example. The other connection is that the work that the employees needed to perform to get them their strawberries, that's also how it's connected. It's attached to where the employee also needs to perform the work to provide the client employer with the product or services they then provide to their customers. Okay. Okay. Thank you. Would you like to save the rest of your time for rebuttal? Yes, please. All right. Good morning, Your Honors. I represent Red Blossom, and I've been a lawyer, actually, in the produce industry since the 1980s. And I'd like to just start with addressing one of the comments Your Honors made about Walmart or Costco coming out to examine strawberries. In fact, in the usual course of business, places like Walmart, Costco, Vons, Safeway, actually do directly, in this case they didn't, but they do directly contract with the growers on occasion. And, in fact, Walmart had contracts with a client of mine in the early 2000s where they specifically, a strawberry grower in Santa Maria, contracted directly with him to buy strawberries and advertised in their stores that they had a direct connection with strawberries. Well, that's not part of this record, though, is it? What? That's not part of this record. Yeah, but I'm just addressing the question that you asked. And so that, in fact, the grocery stores do come out and do have direct contracts and do advertise that they're sourcing strawberries directly. So if this case went the way that the appellants go, that it would have liability in the industry. Well, we're looking for a stopping place because the language that the California legislature chose is very broad. And it certainly seems to me that it's susceptible of the interpretation that was provided by opposing counsel. So based on the language of the statute, what is the stopping point in your view? So the stopping point in the legislation is the fact that it's talking about supplying labor, not supplying product. And so here you have two separate businesses. They are not the same business. And so you have a growing business and you have a farmer that goes out and plants crops. They tend to them. They fertilize them. They spray them. And then they harvest them. And then they deliver them for sale. And then my client, Red Blossom, and also Better Produce, cools the produce and finds clients coast to coast who they have relationships with to purchase the produce. And they arrange for the transport and the sale. And then my client remits proceeds and they take a commission out of it. Why isn't the labor being supplied when the farmers are doing the work that Red Blossom needs in order to have the strawberries to sell? Because they're supplying a product. So my client doesn't own the product. So it's just like you have a Ford dealership and they're selling Fords. And they're selling them and they're making a commission on them, but they don't produce the vehicle. And they couldn't be in business as a Ford dealership without the Fords being produced. But you're not going to say that they have to monitor what's going on in the factory. That's the same thing. Just because it's agriculture doesn't change it. It's the same as if it was a widget. You have to produce a strawberry and then somebody sells it. And they're two separate businesses. But is it significant under the statute in order to determine who's liable under 2810 that what would otherwise be a simple middleman in the transaction who goes out and finds customers and links customers with the growers, there is evidence in the record here, and I think it was your client, actually put its own labels and represented to the public that these were red blossom strawberries as opposed to Garcia Farms or whatever. And in addition, I think owned some of the farmland itself on which the strawberries were grown. So does that distinguish your client from a more traditional middleman who doesn't have either of those attributes? I would say no, because in the produce industry in general, that people who are marketing produce market them under their own label. Everybody does that. That's not anything specific or unique to this particular situation. So you have the marketing companies, and they label it under their own name, and that is common in the industry. And it's also common in the industry for sales companies to lease a large amount of ground, and so they have something to offer growers. They can sublease them ground, and so the growers, because ground is hard to come by, it's very precious, and so that you have a carrot, so to speak, to get good growers to come to you and say, I can sublease the land. But in this particular situation, it was a traditional fair market value lease. The growers paid rent, and then they also used the ground for separate business ventures, separate and aside from what they did with Red Blossom. So in the record, these farmers earned millions of dollars a year selling strawberries to the frozen market that had nothing to do with Red Blossom. And these workers worked for them doing that, growing strawberries for the freezer market. And so what you have to look at here is the fact that 2810.30 specifically states that it was not meant to change independent contractor relationships. These were independent businesses, and if you look at the record and look at what the judge analyzed, these were corporations. They were properly capitalized. The businesses owned their own equipment. They had their own labor forces. They had their own businesses. They were separate businesses. So this is not like the situation of the Marriott Hotel where you have a clerk at the desk and you think it's employed by Marriott, but they're employed by a third party. Here we have people selling produce, having relationships with a Costco, with a Safeway, putting together that part of the business, and it's a separate business. Help me with the facts here. Where is Red Blossom located in relationship to the farms? They have offices in Santa Maria, so they were located close by. But Red Blossom also markets strawberries grown in Florida and grown in Mexico. Do they do anything other than market strawberries? So Red Blossom did have a separate—it's in the record a separate business venture where they grew strawberries, but it had nothing to do with these farmers. So they have 500 acres where they grew strawberries on their own. It was their own separate business. But then they market 3,000 acres of strawberries where they have no ownership interest. That's outside of what we're talking about in this case. Exactly. So didn't the district court think that because of Red Blossom being in the farming business, the labor was within the usual course of business of Red Blossom? Yes, that's what the district court judge did say that, but then he said in this particular instance there was no labor supply to Red Blossom's farming business. So the workers here, the appellants, had nothing to do with that farming business, and so that's why they weren't supplied in the usual course of business. So usual course of business, if the farmers had, for example, given workers to Red Blossom, they were calling on the phone, calling customers to buy strawberries. The workers set up a roadside stand to sell strawberries. That would have been the farmers providing workers in the usual course of business of Red Blossom. This statute has a particular definition of usual course of business. Yes. And it says it means the regular and customary work of a business performed within or upon the premises or worksite of the client employer. Right, but here the usual course of business between these entities was not farming. Red Blossom was not in the farming with respect to this transaction. But their labels were going on the boxes that were coming out of the fields, were they not? Yes. Red Blossom strawberry labels? Red Blossom strawberry labels was on the boxes, that's correct, and that's done throughout the produce industry, throughout the United States. When you have a sales company that contracts with independent growers to supply, they do that everywhere. So that would really, and again, so you have situations where the Red Blossom obviously grows its own strawberries. It's in the box. It's grown by an independent grower. It's in the box. But it's the same thing as if you, okay, you have a Toyota vehicle and it's produced, part of it is produced by an independent contractor. You don't call, you don't. We have a little more than that, though, here, which is what makes it difficult to figure out where to draw the line. Red Blossom and Better Produce were also, in essence, fronting money for cash flow purposes, advancing funds to the tenant farmers in order to help them meet payroll and buy seeds and fertilizer and that sort of thing. That wasn't Red Blossom. That was only Better Produce. Yes, Red Blossom didn't. But that's not unusual in the industry, is it, for the middle entity to front money to the growers? It's not unusual. Again, it's part of a business relationship that you might do that and have loan agreements. But again, that wasn't my client. But I would say that that is not unusual. It's not unusual in any business when you have a supplier relationship to lend money, and that's, again, as long as it's pursuant to promissory notes in connection with the business with Red Blossom. Did you want to save some time for your co-counsel? Yes. No, it's all on the clock. We put all the time on the clock. Oh, there is. Oh, yeah, I'm sorry. I thought. Go ahead. Good morning, Your Honor. Stephen Katz on behalf of Better Produce. Thank you. I wanted to come to a question that was asked, and I don't think it's been quite addressed yet, and where's the stopping point? And I want to suggest a stopping point. I don't know if it's the most satisfactory of stopping points, but we all have to work with the statute the legislature gave us. And my suggestion, Your Honors, is that the stopping point is the plain and ordinary meaning of the language regular and customary work, the language of the statute, the stopping point. Now, particularly in the reply brief, appellants try to argue that statutory language doesn't mean that such work is confined to the actual work of a business. Respectfully, I don't understand what the ordinary meaning of the phrase regular and customary work could be other than the actual work of the business. If work is not actual work of the business and it's relevant to the business, then it's got to be work performed by another business. And as soon as appellants suggest that actual work can be shoehorned in within the domain of regular and customary work, you introduce the notion that work that is somehow a but-for cause of the business, i.e., I sell widgets, but for somebody in Taiwan manufacturing widgets, I wouldn't have widgets to sell. Yes, but there's an additional qualification here. It says the regular and customary work of the business performed within or upon the premises or worksite of the client employee. Correct. And I think that dovetails, but because premises is hooked up to regular and customary work, I think that's a more fundamental concept. Both come into play. The reason I emphasize regular and customary work is because once you limit regular and customary work to the actual work done by the business, that disposes of the appeal with regard at least to better produce. And that's because the district court found that better produce was not some kind of integrated enterprise that's in the business of producing fruit and selling fruit. The district court was very specific about that. Sorry. Sells the fruit. Please excuse my misstatement. Sells the fruit. Does not produce the fruit. And it drew that distinction between better produce and red blossom in that respect. But it has a very close relationship. That's the problem. Close relationship. Well, they're located very close together. The red blossom and better produce own the land and are the landlord. They make very frequent inspections. In one case, they fronted the money. There are a lot of facts here that you have to look at. Your Honor, I believe the district court found, at least with regard to better produce, that the inspections were infrequent. But they did exist. That is correct. And, yes, money was fronted. And that was not the only source of fronted money for these growers. The growers control the land. Some of the strawberries grown on the land were marketed through better produce to end users. Some were not. That division was chosen by the growers. So there is a close relationship to a certain degree, but an imperfect one. Almost like a Venn diagram, overlapping at some points but not others. This is far from the paradigmatic situation that I think the legislature was aimed at, which is you have a business and you decide some aspect of your business is difficult to deal with and you want to peel it off and put it in the hands of an independent contractor and wash your hands of compliance issues. I.e., a hotel, you want to get rid of housekeeping, therefore you just simply contract all housekeeping functions out. The housekeeping is clearly part of not only the regular and customary work of running a hotel, it's actual work that was done. I wouldn't want to stay at a hotel that didn't have housekeeping. I suspect you wouldn't either. That is actual work. That's the paradigmatic example. That's not what happened with regard to better produce. The district court found they're in the business of marketing. Their customers are the farmers or the growers. They market the fruit and they take a small commission and the money goes to the growers. That's just very different than the paradigmatic example. There is a stopping point. If I can beg the indulgence of our presiding judge, I do have one question that I'd like both sides to address. It seems to me, given the significance of this issue and the relative young age of the statute, that we should seriously consider certifying the question to the California Supreme Court. What's your position on that? My position on that is that Your Honor should not. I don't think it's appropriate to certify a question either because the statute is young per se or because the issue is thorny per se. Now clearly if there were a problem with ambiguous language, that would be different. But here the language is straightforward and it's conventional meaning. The dispute here is over, in the appellant's argument, is whether the plain language passed by the legislature accomplishes the policy goals that appellants suggest the legislature had in mind. We disagree that those are the policy goals. And of course the parties can have a debate over what's the best policy, but that's really irrelevant here. Here it's ordinary language. There don't appear to be any technical. There doesn't appear to be any ambiguity, at least not an ambiguity that would be relevant to deciding this appeal, particularly on the benefit of the state. I guess the ambiguity arises in the basis of the question that Judge Okuda posed, which is what do we consider in order to determine the stopping point of liability? Is there some kind of a multi-factor test that's involved or some fact that is key that must exist and be found by a court before we can say we've reached the end of the road? I understand that, Your Honor, and I think the stopping point is simply what is the regular and customary business of the entity? But that's a difficult question to answer given the varieties of activities and even the differences between Red Blossom and Better Produce in terms of one did things the other did not. Your Honor, I would suggest that that rationale begins to tiptoe away from the notion that we're presented with a statute that is ambiguous, that needs to be clarified, and begins tiptoeing over to a notion that this is a relatively hard case to decide under ordinary statutory language. At some point, and I'm not suggesting this is the point, I'm not sure exactly how to draw the line, but at some point that rationale sort of tiptoes away from asking the state courts to opine where their input is needed and tiptoes over to handle the harder cases for us because... Well, I guess the problem is that they are the final expositors of California law, and this is purely a question of statutory interpretation under California law, which has great significance to an aspect of the business of California that is heavily dependent on agriculture. There's a lot of money involved here and a lot of potential liability, not only for the agricultural industry, but for virtually every other industry that produces and sells goods and services. Respectfully, Your Honor, not with regard to the record with regards to better produce. Okay. Which is exactly why I'm trying to urge this. Thank you. Better produce is an easy case. Okay. Thank you, Your Honor. I think we have your argument. Thank you. You have a few minutes for rebuttal. Okay. To address your first question, Your Honor, yes, it's this case. Sorry. To address your first question, this case should be referred to the California Supreme Court. As you said, it's a close call. The California legislature was trying to cover all industries, was trying to cover all the different outsourcing forms that companies use to remove their liability from the labor, and as we've argued in our brief, regular and customary work can mean the actual work, can mean the core work, premises and worksites. It's a question of if you limit it a lot, then are you leaving essentially people out that are supposed to be covered? One of the examples is the cable technicians. The district court found that you needed to show sufficient control and power to prevent the violations, but in two cases that Red Blossom cited in their brief, Jacobson and WE Economics, it shows that not even the cable technicians can meet that standard, and they would be left out of the statute when the legislature set a specific standard of when they're not protected, and that is when they have the uniform that says the name of the labor contractor and their vehicles have the name of the labor contractor. My second point is that Better Produce argues that they're just a seller, and, sure, that is one of their businesses that they do, but they also forget to highlight that they had the land, the growers came to them for that land, and when they gave them that land before even the strawberries were planted, they had the exclusive right to those strawberries. Before the farm workers even came in, if the farm workers for whatever reason failed to properly cultivate those strawberries, they could come in and take over production. The strawberries were grown in their labels. Their own workers came in and performed work at those premises and worksites, and for that reason it's not just simply this is what I say I do, that I'm a seller, and that's why California enacted this statute specifically because it wanted to get at all the different ways in which companies separate the labor and the risk of the unpaid wages falls on the workers and not on the companies that are benefiting from that labor. I think that's all I wanted to say. All right. Thank you. Thank you, guys, for your arguments. The case of Morales-Garcia v. Better Produce and Red Blossom Sales is submitted.
judges: SCHROEDER, TALLMAN, IKUTA